# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KATHRYN BROOM,                                    )
on behalf of herself and others similarly         )
situated,                                          )          13-CV-00447
                                                   )
          Plaintiffs,                )          Judge Elaine E. Bucklo
                                                   )
        v.                          )          Mag. Judge Young B. Kim
                                                   )
MIDLAND CREDIT MANAGEMENT,                         )
INC.; MIDLAND FUNDING LLC;                         )
and ENCORE CAPITAL GROUP, INC.,                    )
formerly MCM CAPITAL GROUP, INC.,                  )
                                                   )
          Defendants.                )

## SECOND AMENDED COMPLAINT – CLASS ACTION

## INTRODUCTION

      1.     Plaintiff Kathryn Broom brings this action to secure redress against unlawful

collection practices engaged in by defendants Midland Credit Management, Inc. ("MCM");

Midland Funding LLC ("Midland Funding"); and Encore Capital Group, Inc., formerly known

as MCM Capital Group, Inc. ("Encore"). Defendants are sometimes collectively referred to as

"Midland." Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C.

§1692 et seq. ("FDCPA"), and the Illinois Consumer Fraud Act, 815 ILCS 505/2. Many of the

allegations track those made by the Attorney General of Minnesota in *State v. Midland Funding*,

*LLC*, 27-CV-11-11510 (Hennepin Co. Dist. Ct.).

## JURISDICTION AND VENUE

      2.     This Court has jurisdiction under 28 U.S.C. §§1331, 1337 and 1367 and 15

U.S.C. §1692k (FDCPA).

      3.     Venue in this District is proper because defendants' collection communications to

plaintiff and numerous class members were received in this District.

## PARTIES

### Plaintiffs

4.     Plaintiff Kathryn Broom is a resident of Cook County, Illinois.

### Defendants

5.     Defendant Midland Funding LLC is a limited liability company chartered under Delaware law with its principal place of business at 3111 Camino Del Rio N, Suite 1300, San Diego, CA 92108-8875.  It does or transacts business in Illinois. Its registered agent and office is Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

6.     Defendant Midland Funding LLC is in the business of taking title to charged-off debts allegedly owed by consumers and originally owed to others.

7.     Defendant Midland Funding LLC then seeks to enforce the debts against the consumers.

8.     Defendant Midland Funding LLC is one of the nation's largest debt buyers. Midland purchases electronic portfolios of old consumer debt from some of the nation's largest credit and telecommunications companies for about three cents on the dollar. Midland is financed in part by some of the nation's largest banks — including several that sell consumer debt to Midland.

9.     Since inception, Midland and its affiliates have paid about $1.8 billion to purchase about 33 million consumer accounts with a face value of about $54.7 billion.

10.     Defendant Midland Funding LLC has paid an average of less than 10 cents on the dollar for the debts it has purchased or claimed to purchase.

11.     Between December 6, 2012 and December 20, 2012, defendant Midland Funding LLC filed 1,000 collection lawsuits in the Circuit Court of Cook County, in addition to hundreds of others in other Illinois counties.

12.     Midland Funding LLC files over 12,000 collection lawsuits per year in the Illinois courts.

2

13. The mails and telephone system are used in connection with the prosecution of these lawsuits.

14. Defendant Midland Funding LLC is a "debt collector" as defined in the FDCPA.

15. Defendant MCM is a Kansas corporation with its principal place of business at 3111 Camino Del Rio N, Suite 1300, San Diego, CA 92108-8875. It does or transacts business in Illinois. Its registered agent and office is Illinois Corporation Service Co., 801 Adlai Stevenson Drive, Springfield, IL 62703.

16. Defendant MCM is a collection agency and collects the debts held in the name of Midland Funding, LLC.

17. Defendant MCM holds a collection agency license from the state of Illinois.

18. Defendant MCM is a "debt collector" as defined in the FDCPA.

19. MCM and Midland Funding LLC are under common ownership. Both are subsidiaries of Encore, a publicly traded Delaware corporation, with offices at 3111 Camino Del Rio N, Suite 1300, San Diego, CA 92108-8875.

20. Encore describes itself on its Web site as "a systems-driven purchaser and manager of charged-off consumer receivable portfolios."

21. Encore (a) secures funds from investors and lenders for the purpose of purchasing the debts to which Midland Funding LLC takes title, (b) devises the collection strategies used by the other defendants, including those described below, and (c) participated in the debt collection activities complained of.

22. Encore is a "debt collector" as defined in the FDCPA.

23. Defendant Encore has stated in its filings with the Securities & Exchange Commission that it is "a leading accounts receivable management firm . . . ." Form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto.

24. On March 10, 2005, Encore stated to public investors that it is a "50 year old purchaser and manager of consumer receivables portfolios." Form 8-K filed by Encore with the

3

SEC on March 10, 2005.

25.     Encore is a "purchaser and manager of charged-off consumer receivables portfolios" - i.e., bad consumer debts." Form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto.

26.     Encore "acquires these portfolios at deep discounts from their face values". Form 10-K filed by Encore with the SEC for the year ending December 31, 2004, original p. 2) By "deep discount" is meant 1.8% to 3.86% of face value. (Id., original p. 28)

27.     Encore "spent $ 46.1 million to purchase approximately $ 1.2 billion in face value of portfolios during the fourth quarter of 2004, a blended purchase price of 3.86% of face value. 96% of the portfolios purchased in the fourth quarter of 2004 were credit card receivables." Form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto.

28.     On March 3, 2005, Encore stated to public investors that:

**Turning to the purchasing market, our purchases for the first three quarters of the year were relatively modest, because of what we deemed to be a lack of opportunities that met our high standards. The market continues to be highly competitive,   and it's looking like it could remain that way for quite a while. Accordingly, we have adjusted our strategy to reflect the current environment. We determined that we should not bypass profitable opportunities simply because they could not generate the high level of returns we have typically demanded, there are sufficient opportunities to purchase portfolios that can be nicely profitable for the Company. And in the current environment, it's in our best interest to acquire these portfolios rather than waiting for prices to come down.**

**With that being said, we invested $ 46.1 million in new portfolios in the fourth quarter, at an average purchase price of 3.86 percent of face value. Almost all of these purchases were credit card portfolios and that's where we found the most attractive opportunities in the fourth quarter. These purchases were made with our former credit facility that expired at the end of the year. We were able to modify the terms of that credit facility during the fourth quarter, to put a ceiling on the total interest that we will have to pay on these portfolios. The lower interest expense associated with these portfolios will help offset the higher prices,  and the resulting lower collection multiples and enable these portfolios to still generate nice profits for the Company."**

The statement was made by Carl C. Gregory, III, Vice Chairman and CEO of **Encore Capital Group, Inc.**, and is quoted in the Form 8-K filed by Encore with the SEC on March 3, 2005, including Exhibit 99.1 thereto.

4

29.     Encore devises the "collection strategies" used by its subsidiaries. Form 10-K

filed by Encore with the SEC for the year ending December 31, 2004, original pp. 3, 6) On Oct.

28, 2004, Encore CEO Gregory stated in an earnings conference call:

> . . . Our board also elected Brandon Black, President and Chief Operating Officer of
> the Company, Brandon has been Executive Vice President and Chief Operating
> Officer for the past 5 years and has done a superb job. Brandon is the architect of
> many of the analytical procedures and collection processes that distinguish Encore's
> approach to the business. His intelligence, analytical ability and drive for success
> have been instrumental in Encore's success and in his new role will be key factors as
> we continue to build the business. . . .
>
> On the purchasing front, we invested $ 21 million in new portfolios during the
> quarter, up 10 percent from the prior year's quarters purchases of $ 19 million. Our
> average purchase price for the quarter was 2.91 percent which was down slightly
> from last year's 3.02 percent. This was not as much as we had hoped to invest but
> appropriate given the high prices for much of the available supply.
>
> Year-to-date, our purchases have been $ 57 million or about $ 7 million less than
> last year's first 3 quarters. For the year-to-date, approximately 48 percent of our
> purchases have been non-credit card, compared with just 6 percent last year for the
> same period. We will have more to say about purchasing in a minute but the
> purchasing discipline and analytical approach we've always taken are more
> important now than ever before. . . .

30.     Among the "collection strategies" is use of what Encore calls "our contingent

agency outsourcing channel", which involves the use of non-Encore-owned collection agencies.

Statement of Encore CEO Gregory during earnings conference call on March 3, 2005. On Oct.

28, 2004, Encore COO Brandon Black stated in an earnings conference call:

> Our most recent innovation is . . . the development of a targeted agency outsourcing
> program. In contrast to the typical outsourcing cycle that moves static pools of
> accounts from agency to agency on a prescribed rotation, we are using our analytics
> to determine those individual accounts that cannot be profitably collected through
> our internal processes and are placing them with outside partners to generate
> incremental returns.
>
> In general, as we said before, we expect about 80 percent of the accounts we
> purchased to pay us nothing during our ownership period. Recognizing that as a
> huge opportunity, we started a business development team late in 2003 to pursue
> new strategics for penetrating that large pool of accounts. Some areas of focus for us
> were low balances, accounts with no contact information and accounts beyond their
> legal statutes.
>
> In the third quarter of 2004, collections from this channel amounted to $ 4.6 million,
> up from nothing in 2003. We believe much of these collections are incremental to
> our champion strategy and that channel will grow in 2005 and beyond. We are

5

**continually pursuing profitable liquidation strategy that will leverage our talented and deep management team. We believe our account level analytics will continue to unlock additional value on our portfolios and this approach should keep improving liquidation of our entire portfolio and provide flexibility to buy in the future.**

31.     Encore is responsible for determining what debts to purchase and at what price. In an earnings conference call conducted by executives of Encore on Aug. 3, 2004, Encore CEO Gregory stated:

**Encore enjoyed another good quarter. Our collections, revenue and net income all increased. In addition, we closed a terrific new loan with J.P. Morgan Chase that dramatically lowers our cost of borrowing, increases our flexibility, and should result in better financial returns for Encore.**

**Finally, just after the end of the quarter, we closed the biggest purchase we've ever made on terms we considered quite attractive. We are very excited about our industry and its future, but most importantly, Encore's ability to excel in the future.**

32.     On Aug. 3, 2004, Encore CEO Gregory stated in another such call:

**We believe our business model is especially well-suited to this changing environment. Specifically, our business model emphasizes customer-level rather than portfolio-level analytics, innovative and flexible collection processes and conservative accounting.**

**The keystone to everything we do is customer-level analytics - understanding the individual customer and his changing ability to pay. Prior to purchase and throughout our ownership, we analyze the individual customer's ability and willingness to pay. We are always asking the same question - can this particular customer pay us all or some of what he owes now? By focusing on the customer and information about him, we are able to move comfortably across various asset types as well as the portfolio ages or time since charge-off. In this process, a score is generated for every single account we own and the score is refreshed quarterly to ensure that it maintains its accuracy.**

**The second major aspect of our business model is our use of innovative collection strategies that are driven by the underlying collectibility score of each customer. In other words, to fully benefit from the new information we are generating about the individual customers, we have to be able to apply different collection strategies as appropriate, or at least be able to apply the traditional approaches in new ways that will be more effective.**

**We now have eight unique revenue channels that each contribute more than $1 million per month in collections, including direct mail, balance transfer, external legal, and our recently developed agency outsourcing strategy.**

33.     Because of its intimate involvement in collection activities, including the use of non-Encore owned collection agencies, Encore is a debt collector as defined in the FDCPA.

6

## **FACTS – GENERAL**

34.     Midland Funding LLC and MCM file and serve upon the defendant in each collection lawsuit a mass-produced "robo-signed" affidavit generated at their St. Cloud, Minnesota office.

35.     Employees who "robo-signed" the affidavits have testified under oath that they signed up to 400 computer-generated form affidavits a day without reading them, without personal knowledge of their contents, and/or without verification of the accuracy of the underlying information. Through the use of these false, "robo- signed" affidavits, defendants have defrauded numerous consumers.

36.     When defendants purchase consumer debt, they generally acquire only an electronic portfolio, or "datastream," containing limited categories of information about the accounts, such as the name of the alleged debtor and amount allegedly owed. Debt buyers such as Midland and MCM sometimes contract for the right to request and purchase supporting documentation after acquisition of the portfolio on an account-by-account basis.

37.     Prior to filing debt collection lawsuits, Midland and MCM engage in practices that place a premium on quick collections over accuracy.

38.     Midland churns out millions of collection letters and telephone calls annually, often using incomplete and/or inaccurate electronic information purchased from original creditors, or incorrect information obtained through their own efforts. Defendants sometimes target the wrong person for collection or attempt to collect debts that have been paid, settled, or are otherwise uncollectible.

39.     Defendants send mass mailings of collection letters to consumers, often offering discounts to settle alleged debts. In 2010, defendants sent collection letters to approximately 8.7 million people.

40.     MCM also oversees telephone campaigns from call centers in Minnesota, California, Arizona, and India. In 2010, MCM called approximately 8.6 million people.

7

41.     Midland regularly directs collection letters and telephone calls to the wrong person or to someone who has already paid or settled an alleged debt. Moreover, MCM's initial collection letters generally include very little information about the alleged debt, no supporting documentation, and no proof that ownership of the debt was properly assigned to Midland.

42.     In some cases, when a consumer contacts Midland or MCM to dispute a debt or ask for additional information, little or nothing is done by the companies to investigate or verify the legitimacy of the alleged debt. Instead, defendants often simply provide the consumer with the name of the original creditor, the account number, and the alleged current balance, as found in a purchased portfolio's electronic datastream. Defendants regularly contend that they have resolved a dispute by providing such cursory information and resume collection after doing so.

43.     Midland often takes the position that they do not need to prove that the individual owes the debt to continue collection, but rather that the consumer must prove the debt is not owed for collection to cease.

44.     In order to actually investigate a consumer's dispute or respond to a request for information about an alleged debt, defendants would have to review supporting documentation, if it exists, follow up with the original creditor, and/or sacrifice their "efficiency." Doing so would cost defendants money. Consequently, it is more "efficient" for defendants to simply exert pressure on consumers to pay the purported debt than to investigate disputes or request information about the alleged debt. Such pressure may include threats to report the alleged debt to the credit rating agencies. Some people pay defendants just to avoid false reports to credit bureaus or to otherwise avoid harassment or the legal process.

45.     Midland, like debt buyers generally, has little incentive to spend the time and resources necessary to respond to consumer disputes and requests for information about alleged debts. They profit not from resolving disputes or investigating the accuracy of the debts of which they are collecting, but by getting alleged debtors to pay money, whether or not the individuals they are targeting actually owe the money.

46.    Midland generates millions of dollars in profits while receiving payments on less than one percent of their accounts each month. For 2010, defendants reported approximately $364 million in revenue and $49 million in profits.

47.    In filing debt collection lawsuits against debtors, Midland defrauds consumers by using false affidavits that are "robo-signed" by individuals who have no knowledge of the alleged debts.

48.    Defendants generate a significant portion of their revenue by filing lawsuits and collecting on judgments that are granted by courts in lawsuits filed against individual consumers.

49.    Midland Funding LLC serves as the plaintiff in these actions as alleged owner of the debt or successor in interest to the original creditor, while MCM manages and oversees collection efforts.

50.    Midland filed 245,000 collection lawsuits nationwide in 2009 alone.

51.    Midland Funding files some 12,000 collection lawsuits each year in Cook County alone, and thousands others each year in other Illinois counties.

52.    The majority of these lawsuits result in default judgments in favor of Midland Funding because the unrepresented defendant failed to appear or respond.

53.    When using the courts to collect on purchased debts, Midland typically files a two-page, boilerplate complaint that identifies Midland as the successor in interest to an alleged creditor, asserts a claim for breach of contract, and demands judgment. The vast majority of these lawsuits are filed against unrepresented consumers.

54.    Midland abuses the court system, by filing lawsuits for which they do not have proper evidentiary support.

55.    Midland files thousands of collection actions each year, often with little or no admissible evidence, knowing that they will be able to obtain default judgments against the overwhelming majority of people, who are not represented by attorneys and who do not respond to these lawsuits.

9

56.     As plaintiff, Midland identifies itself as the owner of the alleged debt or successor in interest to the original creditor, and claims that the defendant breached a contract with the creditor by failing to pay for goods or services purchased on an account issued by the creditor.

57.     In order to leverage an individual consumer into settlement, Midland has filed false, mass-produced affidavits with its lawsuits. Many of these affidavits have been executed at MCM's office in St. Cloud, Minnesota. These affidavits were signed by MCM employees who attest to the validity of the alleged debt without reading the affidavit, reviewing records, and/or having any knowledge of the validity of the alleged debts.

58.     Many people subjected to defendants' practices do not understand the court system, cannot afford to hire an attorney, and/or feel forced into settling a lawsuit in which Midland may be seeking a total judgment that has ballooned to more than twice the principal amount of the alleged debt due to interest, attorneys' fees, etc.

59.     Midland has affirmatively deceived and defrauded consumers by filing false, mass produced, computer-generated affidavits that are "robo-signed," or signed without the affiant  reading the contents of the document, and/or signed by MCM employees with no personal knowledge of the validity of the debt or other facts to which they are attesting. Many of these affidavits, including those served on plaintiff,  have been executed at MCM's St. Cloud, Minnesota office.

60.     MCM employees have signed false affidavits served on Illinois consumers to leverage payments from alleged debtors.

61.     Three separate MCM employees have admitted under oath that they "robo-signed" affidavits without knowing the contents of the affidavits and without personal knowledge of the debts to which they were attesting. All three employees worked in MCM's St. Cloud, Minnesota office.

62.     Judy Richter signed affidavits for Midland between 2004 and 2009, and was deposed in October of 2010.

63.     Elizabeth Neu signed affidavits for Midland between 2005 and 2009, and was deposed in October of 2010.

64.     Ivan Jimenez signed affidavits for Midland between 2008 and 2009, and was deposed in October of 2008.

65.     Ms. Richter, Ms. Neu, and Mr. Jimenez testified about MCM's process of executing affidavits.

66.     Ms. Richter and Ms. Neu testified that they each signed up to 300 affidavits a day, and Mr. Jimenez testified that he signed up to 400 a day. They signed affidavits without reading them and/or without checking into or having any knowledge of the accuracy of the information to which they were attesting, including the validity of the alleged underlying debt.

67.     A typical Midland affidavit consists of five paragraphs and a signature block. The computer-generated affidavits contain many falsehoods and do not meaningfully substantiate the authenticity of the alleged debt.

68.     The first paragraph of the affidavit states that "I am employed as a Legal Specialist and have access to pertinent account records for Midland Credit Management, Inc. ('MCM'), servicer of this account on behalf of plaintiff. I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on plaintiff's behalf. Plaintiff is the current owner of, and/or successor to, the obligation sued upon, and was assigned all the rights, title and interest to defendant's [name of issuer and account number]. I have access to and have reviewed the records pertaining to the account and am authorized to make this affidavit on plaintiff's behalf."

69.     The second paragraph of the affidavit states that "I am familiar with the manner and method by which MCM creates and maintains its business records pertaining to this account. The records are kept in the regular course of business. It was in the regular course of business for a person with knowledge of the act or event recorded to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such record. In

the regular course of business, the record or compilation is made at or near the time or event." It then recites what MCM's records purportedly show.

70.     The affidavit concludes with a "certification" that states that, "I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge."

71.     The testimony of Ms. Richter, Ms. Neu, and Mr. Jimenez indicates that they had no personal knowledge of the information in the affidavits they signed for Midland, that the affidavits were computer-generated and that they did little or nothing to review their contents.

72.     For example, Mr. Jimenez testified that he personally signed up to 400 affidavits a day.  Mr. Jimenez said he simply found stacks of affidavits on a printer, signed them, and sent them by internal mail to a notary, as stated in the following testimony:

> Q.     **Where do your affidavits come from?**
>
> A.     **As far as what I deal with, they just come from the printer as far as where we get them. . . . .**
>
> Q.     **You mentioned earlier, when I asked you about that, you signed these affidavits and had them notarized. Was the notary present in the room when you were signing all the affidavits, or do you sign them and give them to the notary?**
>
> A.     **I sign them and give them to the notary.**

73.     Similarly, Ms. Neu testified the she also got her affidavits from the "printer":

> Q.     **Okay. Okay. Now with respect to the affidavits that you signed, how would those come to your desk?**
>
> A.     **There was — we had a big printer. They didn't come directly to our desk. We had a big printer and they would all print out at the same time. . . .**
>
> Q.     **Okay. Do you know how they were caused to be printed?**
>
> A.     **No. That was Midland Credit.**
>
> Q.     **Okay. And to you know the person at Midland Credit that printed those?**
>
> A.     **No.**

74.     Likewise, Mr. Jimenez also testified:

Q.  Did you ever have any contact with [the alleged debtor], any business contact at all?

A.  I did not personally.

75.  Mr. Jimenez also testified:

Q.  So you simply sign them?

A.  Yes.

76.  In the following deposition exchange, Ms. Richter testified that she never read the text of the affidavits:

Q.  Approximately how many affidavits would you sign each day when you were signing affidavits?

A.  Anywhere from 100 to 300.

Q.  Okay. And about how long would you spend on each one before you signed it?

A.  I -- don't know. It would depend on how fast the – it would depend on what you were doing. If you were stamping and notarizing it takes longer.  If you are just signing it takes less time, so would say one to two minutes.

Q.  Okay. Is there anything else you would do when you were signing affidavits other than sign them? I mean would you - - would you review the text that was in them?

A.  No.

77.  Similarly, Ms. Neu testified that she did not read the affidavits before, signing them either:

Q.  Did you ever read the affidavit all the way through?

A.  No.

Q.  Up until and including today have you ever read the affidavit all the way through?

A.  No.

78.  Ms. Neu also testified that she did not confirm the accuracy of the affidavits:

Q.  Okay. Did you review any of the Midland Credit records before you signed the affidavit?

A.  No.

13

Q.     And did you review any other documents before you signed the affidavit?

A.     No.

Q.     Okay. And would you check the affidavits at all to make sure that even the information that was supposed to be there was there?

A.     No.

79.     Ms. Neu's lack of knowledge is illustrated by the following testimony:

Q.     And it is my understanding that personal knowledge that you had was the information in Midland Credit's database?

A.     Midland Credit Management.

Q.     Midland Credit Management. In their database?

A.     Yes.

Q.     Okay. And nothing else; is that correct?

A.     That's correct.

Q.     And can you describe for me what information is in Midland Credit Management's database?

A.     No. I do not have that information.

Q.     Okay. Did you ever see the information that was in Midland Credit Management's database - -

A.     No.

Q.     – at any time?

A.     No.

Q.     Okay. So how would you know then what information was in Midland Credit Management's database?

A.     I trusted that the information that was sent to me was true and accurate.

Q.     Okay. And what information was that, that was sent to you?

A.     In the affidavit that came.

80.     The testimony of Ms. Richter, Ms. Neu, and Mr. Jimenez shows that they did not have any knowledge whatsoever of the validity of the alleged underlying debt.

81.     They testified that they signed affidavits without checking the accuracy of the

14

information in the affidavits, and without any independent knowledge of the veracity of the alleged "facts" contained in the affidavits.

82.    For example, Ms. Neu testified:

**Q.**    **Do you now or did you at any time in the past ever have any knowledge of the relevant financial information concerning any of the Midland Funding or Midland Credit accounts?**

**A.**    **No.**

83.    Ms. Neu similarly testified that she had no knowledge of how interest was calculated or applied:

**Q.**    **When you worked for Midland Credit Management did you look at the interest rates before you signed these affidavits?**

**A.**    **No.**

**Q.**    **And would you take any measures to independently verify that the numbers were correct other than just looking at the affidavit?**

**A.**    **No.**

84.    Ms. Neu also testified:

**Q.**    **Do you now or did you at any time in the past ever have any knowledge of the relevant financial information concerning any of the Midland Funding or Midland Credit accounts?**

**A.**    **No.**

**Q.**    **Do you now or did you at any time have any knowledge regarding agreements that a customer had made with an original creditor before it came to Midland Credit or Midland Funding?**

**A.**    **No.**

**Q.**    **Do you now or did you at any time in the past regarding any of your – the affidavits that you signed have knowledge of whether any defendant used or authorized the use of a credit card account?**

**A.**    **No.**

**Q.**    **Do you now know or at any time did you -- in the past did you know whether any defendant failed to make a payment on an account?**

**A.**    **No.**

**Q.** **Did you at any time know whether Midland Credit Management or Midland Funding had demanded payment from a defendant?**

**A.** **No.**

85. Defendants' affidavits falsely attest to the validity of defendants' ownership of the alleged debts. The sworn testimony of defendants' employees makes clear they lacked the knowledge necessary to make any statements regarding ownership of the debts. None of the affiants participated in the sale and assignment of accounts to Midland or had personal knowledge of portfolio transactions. Mr. Jimenez testified that he did not know anything about the terms of the purchase of an account.

86. Ms. Neu testified that she did not know what a "predecessor in interest" was, and that she thought MCM was the plaintiff and owner of the accounts in cases actually filed by Midland.

87. For example, Mr. Jimenez testified:

**Q.** **You work for Midland Credit Management; correct?**

**A.** **Yes.**

**Q.** **This affidavit lists at the top as a plaintiff, Midland Funding, LLC. What's the relationship between Midland Credit Management and Midland Funding LLC?**

**A.** **I wouldn't be the best person to ask that question. I don't know.**

88. Similarly, Mr. Jimenez further testified:

**Q.** **Well, it says in this affidavit that, in number 3, "That Plaintiff s predecessor in interest sold and assigned all right, title, and interest in this account to the plaintiff." So if it was sold to the plaintiff, my assumption is it was purchased by the plaintiff. And the question I have is, did you have any role or were you involved in any way, shape, or form in the purchase of the account?**

**A.** **I was not.**

**Q.** **Do you know. anything about the terms of the purchase of this account?**

**A.** **I do not.**

89. Similarly, Ms. Neu's testimony shows her lack of information regarding

Midland's ownership of the alleged debt:

**Q.      Do you know what "a predecessor in interest" is?**

**A.      No.**

90.      Likewise, Ms. Neu testified:

**Q.      Do you know what Midland Funding is?**

**A.      No, I'm not familiar with it at all.**

### FACTS RELATING TO PLAINTIFF KATHRYN BROOM

91.      On or about June 19, 2012, a collection lawsuit was filed in the Circuit Court of Cook County in the name of Midland Funding against Kathryn Broom, case 2012 M1 136987.

92.      The complaint and attached documents, including a robo-signed affidavit, served upon Ms. Broom are attached as Appendix A.  Attached to the collection complaint is the affidavit of Denise Condon, dated December 6, 2011.

93.      Ms. Broom was required to hire counsel and pay an appearance fee to defend the lawsuit.

94.      On November 21, 2012, counsel appeared for Ms. Broom.

95.      On December 11, 2012, Midland Funding LLC voluntarily nonsuited the collection lawsuit.

### COUNT I – FAIR DEBT COLLECTION PRACTICES ACT

96.      Plaintiff incorporates paragraphs 1-95.

97.      Defendants' affidavits contain false statements, in violation of 15 U.S.C. §§1692e, 1692e(2), 1692e(10) and 1692f.

98.      Section 1692e provides:

**§ 1692e.      False or misleading representations [Section 807 of P.L.]**
**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .**

  **(2)**  **The false representation of–**
    **(A)**  **the character, amount, or legal status of any debt; . . .**
  **(10)**  **The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . ..**

99. Section 1692f provides:

**§ 1692f.**  **Unfair practices [Section 808 of P.L.]**
  **A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. . . .**

<u>**CLASS ALLEGATIONS**</u>

100. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

101. The class consists of (a) all individuals (b) that one of the defendants sued in an Illinois court (c) and with respect to whom one or more of the defendants filed or served an affidavit in the form included in <u>Appendix A</u>, (d) at any time during a period beginning January 18, 2012 (one year prior to the filing of this action) and ending February 7, 2014 (20 days after the filing of this action).

102. On information and belief, based on a computer search of court records, the class is so numerous that joinder of all members is not practicable. Defendants sued and served affidavits on more than 1,000 persons per month.

103. There are questions of law and fact common to the class members, which predominate over any questions relating to individual class members. The predominant common questions are whether the affidavits are false or misleading and whether the service of such affidavits violates the FDCPA.

104. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

105. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and FDCPA litigation.

106. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible;

      b.    Members of the class are likely to be unaware of their rights; and

      c.    Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendants for:

      (1)    Statutory damages;

      (2)    Actual damages;

      (3)    Attorney's fees, litigation expenses and costs of suit; and

      (4)    Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS CONSUMER FRAUD ACT

107. Plaintiff incorporates paragraphs 1-95.

108. Defendants' practices as described above are both unfair and deceptive, in violation of 815 ILCS 505/2.

109. Defendants engaged in such acts and practices in the course of trade and commerce in Illinois.

110. Defendants' acts and practices are contrary to public policy, oppressive and injurious.

111. Defendants engaged in such acts and practices with the intent of causing financial harm to Illinois consumers, and did in fact cause such harm.

## CLASS ALLEGATIONS

112. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

113. The class consists of (a) all individuals (b) that one of the defendants sued in an Illinois court (c) and with respect to whom one or more of the defendants filed or served an affidavit in the form included in Appendix A, (d) at any time during a period beginning March 12, 2011 and ending February 7, 2013 (20 days after the filing of this action).

114. On information and belief, based on a computer search of court records, the class is so numerous that joinder of all members is not practicable. Defendants sued and served affidavits on more than 1,000 persons per month.

115. There are questions of law and fact common to the class members, which predominate over any questions relating to individual class members. The predominant common questions are whether the affidavits are false or misleading and whether the service of such affidavits violates the Consumer Fraud Act.

116. Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

117. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and collection abuse litigation.

118. A class action is superior for the fair and efficient adjudication of this matter, in that:

        a. Individual actions are not economically feasible;

        b. Members of the class are likely to be unaware of their rights; and

        c. Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

WHEREFORE, the Court should enter judgment in favor of plaintiff and the class and against defendants for:

        (1) Actual damages;

        (2) Punitive damages;

20

(3)    Injunctive relief against further violations;

(4)    Attorney's fees, litigation expenses and costs of suit; and

(5)    Such other and further relief as the Court deems proper.

s/Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Cassandra P. Miller
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, Suite 1800
Chicago, Illinois 60603-3593
(312) 739-4200
(312) 419-0379 (FAX)
courtecl@edcombs.com

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

s/Daniel A. Edelman
Daniel A. Edelman

# APPENDIX A

Returnable in
ROOM No. 602, RICHARD J. DALEY CENTER
9:30 A.M. Sharp
In the Circuit Court of Cook County, Illinois

No. 12 M1 136987

**MIDLAND FUNDING LLC**
Plaintiff
vs.

Return Date: NOV 2 7 2012

Kathryn Broom
Defendant

Amount Claimed: $3,330.04 plus costs

SERVE:
Kathryn Broom
███████████████

**ALIAS SUMMONS**

To each Defendant:
YOU ARE SUMMONED and required:

1. To file your written appearance or your attorney and pay the required fee in Room 602, Richard J. Daley Center, 50 W. Washington St, Chicago, Illinois, 60606 at or before 9:30 a.m.* on

NOV 2 7 2012

2. To file your answer to the Complaint in Room 602 as required by Par. 30 in the Notice to Defendant.

IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS ATTACHED HERETO.

To the Officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service, and not less than 3 days before the date for appearance. If service cannot be made, this summons shall be returned so endorsed.
This summons may not be served later than 3 days before the date of appearance.

THERE WILL BE A FEE
TO FILE YOUR APPEARANCE, IF CLAIM
IS $1,500.00 OR LESS, FEES WILL BE $176.00
OVER $1,500.00 THE FEE WILL BE $186.00
OVER $15,000.00 THE FEE WILL BE $206.00

WITNESS.................................

.................................................
DOROTHY BROWN, Clerk of Court

Date of Service:......................., 20....
(To be inserted by officer on copy left
with Defendant or other person)

Blitt and Gaines, P.C.
Attorney for Plaintiff
661 Glenn Ave.
Wheeling, IL 60090
847-403-4900
Atty. No. 32887

11-42824

The Process Server has been duly appointed Pursuant to a Standing Order for Special Process Servers

███████████████████████████████████

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**12M1 136987**

MIDLAND FUNDING LLC
              Plaintiff

No.

vs.

Return Date:

**JUL 2 6 2012**

Kathryn Broom

           Defendant

Amount Claimed: $3,330.04
Plus court costs

## COMPLAINT

NOW COMES the Plaintiff, by and through its attorneys, Blitt and Gaines, P.C., and complaining of the Defendant(s), states as follows:

1.    The Defendant(s) opened an account with TARGET NATIONAL BANK, account number ▓▓▓▓▓▓▓0591 whereby Defendant(s) could charge goods and services to their account and/or receive cash advances.

2.    The Defendant(s) subsequently defaulted by failing to pay for the indebtedness incurred resulting in the balance due Plaintiff of $3,330.04.

3.    Plaintiff is the assignee of said account having purchased said account in the regular course of business and in good faith and for valuable consideration.

4.    Due demand has been made on the Defendant(s) to pay this amount and the Defendant(s) have failed to do so.

    WHEREFORE, Plaintiff prays for judgment against the Defendant(s) in the amount of $3,330.04 plus interest and court costs.

Blitt and Gaines, P.C.
Attorney for Plaintiff
661 Glenn Avenue
Wheeling, IL 60090
(847) 403-4900
11-42824
32887

This is an attempt to collect a debt and any information will be used for that purpose.

State of ILLINOIS

MIDLAND FUNDING LLC,

Plaintiff

-vs-

KATHRYN BROOM,

Defendant(s).

AFFIDAVIT OF DENISE CONDON
IN SUPPORT OF JUDGMENT

---

Denise Condon, whose business address is 16 Mcleland Road Suite 101, St. Cloud, MN 56303, certifies and says:

1. I am employed as a Legal Specialist and have access to pertinent account records for Midland Credit Management, Inc. ("MCM"), servicer of this account on behalf of plaintiff. I am a competent person over eighteen years of age, and make the statements herein based upon personal knowledge of those account records maintained on plaintiff's behalf. Plaintiff is the current owner of, and/or successor to, the obligation sued upon, and was assigned all the rights, title and interest to defendant's TARGET NATIONAL BANK account ██████████0591 (MCM Number ██699) (hereinafter "the account"). I have access to and have reviewed the records pertaining to the account and am authorized to make this affidavit on plaintiff's behalf.

2. I am familiar with the manner and method by which MCM creates and maintains its business records pertaining to this account. The records are kept in the regular course of business. It was in the regular course of business for a person with knowledge of the act or event recorded to make the record or data compilation, or for a person with knowledge to transmit information thereof to be included in such record. In the regular course of business, the record or compilation is made at or near the time of the act or event. The relevant financial information concerning the account includes the following:

3. The account shows that the defendant(s) owed a balance of $3330.04; and I am advised that such balance will continue to accrue interest at the rate set forth in the cardholder

---

AFFIDAVIT OF DENISE CONDON IN SUPPORT OF JUDGMENT -1

agreement/original contract and/or as required by law, until judgment is entered herein, after which interest on the unpaid balance shall accrue as required by law and as set forth within the terms of the judgment.

4. Based upon my review of MCM's business records: 1) defendant(s) opened the account with TARGET NATIONAL BANK on 2006-09-01; 2) the last payment posted to the account on 2009-06-08; and 3) the account was charged off on 2010-01-17.

" I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

DEC 0 6 2011
_____
Date

_____
Denise Condon

STATE OF MINNESOTA

COUNTY OF STEARNS

Signed and sworn to (or affirmed) before me on ___DEC 0 6 2011___ by Denise Condon.

_____
Notary Public

(Seal)

My commission expires:_____

IL168
Blitt and Gaines, P.C.

AFFIDAVIT OF DENISE CONDON IN SUPPORT OF JUDGMENT -2


197169


AFFDEFAULTJDG



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CASE NUMBER

MIDLAND FUNDING LLC
                                    Plaintiffs

-VS-

Kathryn Broom

                                    Defendants

**12M1 136987**

AFFIDAVIT AS TO MILITARY SERVICE

Blitt & Gaines, P.C., Attorney for Plaintiff                          on oath states:

(Affiant's Name and Address)

With respect to defendant Kathryn Broom

(Defendant's Name and Address)

☐ the Defendant is
X the Defendant is not
☐ I am unable to determine whether the Defendant is

in the military service of the United States of America.

This affidavit is based one these facts:   The Department of Defense Web page
https://www.dmdc.osd.mil/.scra/own/home       (See Attached)

                                                              Under penalties as
provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the above signed certified that the statements set forth
in this instrument are true and correct, except as to matters therein stated to be on information and belief as to such matters the
above signed certified as aforesaid that he verily believes the same to be true.

NAME:   Blitt and Gaines, P.C.,   ☐ Pro Se
ARDC#   32887
Attorney for   Plaintiff
Address:   661 Glenn Ave.
City:   Wheeling, IL, 60091
Telephone:   (847)-403-4900

11-42824